875 F.2d 890
 277 U.S.App.D.C. 333, 57 USLW 2735,
1989-1 Trade Cases 68,588, 15 Fed.R.Serv.3d 491
 DANIK, INC., D.C. Corporation, on behalf of self and others
similarly situated,
Cooter & Gell, Appellant,
v.
HARTMARX CORPORATION, a Delaware corporation, et al.
Appeal of COOTER & GELL.
 No. 88-7089.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 23, 1989.
Decided May 19, 1989.
 
 Appeal from the United States District Court for the District of Columbia (Civil Action No. 83-03568).
 Dale A. Cooter, with whom Joseph M. Cahill, Washington, D.C., was on the brief, for appellant.
 Mark W. Ryan, with whom Richard J. Favretto and Evan M. Tager, Washington, D.C., were on the brief, for appellees. Kenneth S. Geller and Douglas K. Mayer, Washington, D.C., also entered appearances for appellees.
 Before STARR, WILLIAMS and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 D.H. GINSBURG, Circuit Judge:
 
 
 1
 This appeal arises from an antitrust action that appellants Cooter & Gell, a law firm, brought on behalf of their client, Danik, Inc., a Washington, D.C. discount clothing retailer. The defendants in that action are appellees here: Hartmarx Corp. and its subsidiaries, Hickey-Freeman Co. (HF) and Hart, Schaffner & Marx (HSM)--collectively, the Hartmarx Group--manufacturers and distributors of men's clothing. After appellants voluntarily dismissed their case, the district court found that both attorney and client had violated Fed.R.Civ.P. 11 by failing to make a reasonable inquiry, prior to the filing of their complaint, into the facts alleged therein. The court awarded sanctions of $21,402.52 against Cooter & Gell and $10,701.26 against Danik.
 
 
 2
 Danik, which is now bankrupt, has not filed a brief in this court; by separate order, we dismiss its appeal for failure to prosecute. With respect to Cooter & Gell, we affirm the judgment in all respects and remand to the district court for it to award appellees the expenses they incurred on appeal.
 
 I. BACKGROUND
 
 3
 Litigation between Danik and Hartmarx goes back to June 1983, when Intercontinental Apparel, Inc., another Hartmarx subsidiary, filed a breach of contract action in the district court, claiming that Danik had failed to pay for approximately $100,000 of Intercontinental merchandise. Danik, represented by Cooter & Gell, counterclaimed, alleging that Intercontinental had engaged in price discrimination in violation of the Robinson-Patman Act. In March 1984, the district court granted summary judgment in favor of Intercontinental on the contract claim, and we affirmed. In February 1985, a jury found for Intercontinental on the antitrust counterclaim, and once again, we affirmed.
 
 
 4
 Meanwhile, in November 1983, while the above-described litigation was going forward, Cooter & Gell prepared two additional antitrust complaints--both class actions--against appellees and others. Dale Cooter, Esq., of Cooter & Gell, "presented counsel [for Intercontinental] with draft copies of those complaints and outlined a settlement offer which encompassed the collection suit and the two class actions." Cooter Affidavit at p 7. After Intercontinental rejected the settlement offer, Danik filed the two class action complaints.
 
 
 5
 The first complaint, on behalf of all men's retail clothing merchants in seven metropolitan areas, charged Hartmarx and three of its subsidiaries with price discrimination in violation of the Robinson-Patman Act. The district court stayed that action, pending resolution of the price discrimination counterclaim in the original Intercontinental contract action. In July 1986, Danik voluntarily dismissed this class action.
 
 
 6
 Danik's second class action complaint, which forms the background of the present dispute, was filed on behalf of "all men's retail clothing merchants in the United States other than ... [Hartmarx's allegedly] exclusive agents...." Danik claimed that the Hartmarx Group had established "an exclusive retailer agent policy" whereby Hartmarx sold men's suits made by HF and HSM to only one retailer in each major metropolitan area of the country, either upon the condition or by agreement that the retailer would sell at Hartmarx's "suggested retail price or at an artificially high price." According to the complaint, appellees thereby unlawfully fixed resale prices, allocated retail markets, and refused to deal with the plaintiff, in violation of the Sherman and Clayton Antitrust Acts.
 
 
 7
 Hartmarx filed a motion to dismiss this second suit, supported by affidavits in which HF and HSM executives denied the existence of any "exclusive retailer agent policy" and showed that, although each brand was distributed by only one retailer in Washington and one in Baltimore, it was in fact the defendants' general practice to sell to more than one retailer in each major metropolitan area. Indeed, these executives reported that each brand was sold to as many as 20 different retailers in some markets. Hartmarx also moved for sanctions under Rule 11, which, in relevant part, states that:
 
 
 8
 The signature of an attorney or party constitutes a certificate by him that he has read the pleading ...; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court ... shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the expenses reasonably incurred because of the filing of the pleading, motion, or other paper including a reasonable attorney's fee.
 
 
 9
 (Emphases added.)
 
 
 10
 In response to the Rule 11 motion, Cooter & Gell submitted two affidavits describing their pre-filing investigation into the facts they had alleged. Joseph Cahill, Esq. stated that he "asked Faye Reid, a secretary at this firm, to telephone the better known clothing retailers in the Washington, D.C. area to inquire of them whether they sold [HSM] suits, and if not, whether they knew who did." Ms. Reid's affidavit, in turn, confirms that she spoke with "salespeople" at eight such retailers and with people in unspecified positions at two others. Based upon these conversations, Cahill concluded that "not one retailer besides Raleigh's appeared to sell [HSM] suits in the Washington, D.C. area." After he had made several calls to menswear stores in Baltimore, with like results, Reid conducted a similar inquiry of Philadelphia and New York retailers. On this basis, Cahill concluded that only one retailer in each of these areas sold HSM suits. In the course of their pre-filing investigation, Cooter & Gell at no time asked anyone at Hartmarx about its distribution practices generally or for the names of the retailers that sold its suits in any metropolitan area.
 
 
 11
 In April 1984, while the defendants' motions to dismiss and for sanctions were pending before the district court, Danik dismissed the antitrust action voluntarily pursuant to Fed.R.Civ.P. 41(a)(1)(i). In June, counsel argued the Rule 11 motion. Cooter stated that the impetus for the complaint had come from the president of Danik, who told Cooter that Danik had been unable to purchase HF and HSM suits, that only one retailer in the Washington, D.C. area carried those brands, and "that it was his understanding that that was a nation-wide practice" on the part of Hartmarx. The district court then took the Rule 11 motion under advisement.
 
 
 12
 More than three and one-half years later, in February 1988, the district court granted the motion, identifying several fundamental deficiencies in Cooter & Gell's prefiling inquiry, 120 F.R.D. 439 (1988). First, counsel's inquiry concentrated solely on HSM "and thus in no way justified the claim of exclusive retail agency arrangements for [HF] apparel." Second, counsel limited their pre-filing investigation to "four eastern cities" and, consequently, had "no support for the allegation that exclusive arrangements existed in every major metropolitan area." (Emphasis in original.)
 
 
 13
 Third, the court concluded that "counsel's random telephone investigation is far removed from the type of systematic inquiry needed to conclude that allegations of the severity alleged by plaintiff are 'well grounded in fact.' " Specifically, the court observed that "counsel contacted only a few retailers in cities where dozens of retailers were in business [and] sought the opinion of salesmen instead of management personnel who might have personal knowledge of the alleged exclusive retail agency policy." Finally, the court noted that "exclusive retail agency policies, by themselves, are not per se violative of antitrust laws." To prevail under the Rule of Reason, a plaintiff must, in addition, "plead, and show, anticompetitive effects ..., such as price-fixing or retail price maintenance, in order to prevail." Counsel's investigation had neither sought nor revealed anything of that sort.
 
 
 14
 The court then turned to the calculation of costs and attorney's fees and concluded that the $61,917.99 requested by Hartmarx was "excessive." The court found that defendants' counsel had devoted substantial time to research "not reasonably necessary to achieve dismissal of the case." The court concluded that an award of $32,103.78 would serve as an appropriate Rule 11 sanction, two-thirds to be paid by Cooter & Gell and one-third by Danik, which had "authorized the prosecution of this lawsuit albeit on the advice of counsel...."
 
 II. JURISDICTION
 
 15
 Appellants argue initially that their client's voluntary dismissal of the class action that gave rise to the Rule 11 motion divested the district court of jurisdiction to resolve that motion. As the question is one of first impression in this circuit, appellants rely on Johnson Chemical Co., Inc. v. Home Care Products, 823 F.2d 28 (2d Cir.1987). There, a district court had vacated plaintiff's voluntary dismissal and, thereafter, imposed Rule 11 sanctions. On appeal, the Second Circuit held that the district court could not then impose sanctions because "[o]nce [the plaintiff] had dismissed the action under Rule 41(a)(1)(i), the court lost all jurisdiction over the action." Id. at 31.
 
 
 16
 Like the other circuits that have confronted this issue, we think a more particularized analysis is in order. See Muthig v. Brant Point Nantucket, Inc., 838 F.2d 600 (1st Cir.1988); Szabo Food Service, Inc. v. Canteen Corp., 823 F.2d 1073 (7th Cir.1987). See also Kurkowski v. Volcker, 819 F.2d 201, 203 (8th Cir.1987) (court retains jurisdiction (1) because defendant's motion to dismiss, filed before plaintiff's voluntary dismissal, renders inapplicable the self-executing dismissal provisions of Rule 41(a)(1)(i), and (2) due to court's "inherent authority over the cases and parties before it"); Greenberg v. Sala, 822 F.2d 882 (9th Cir.1987) (affirming Rule 11 sanction after voluntary dismissal without attention to jurisdictional issue). As the Seventh Circuit has observed in this very context, "[a] court may have power to do some things but not others, and the use of 'lack of jurisdiction' to describe the things it may not do does not mean that the court is out of business." Szabo, 823 F.2d at 1077. For example, a court "that loses its power to decide the merits--perhaps because it has decided them once already [in entering a final judgment]--does not lose power to award attorney's fees that may be in order as a result of what happened before the final decision." Id. Further:
 
 
 17
 An award of fees under Rule 11 is more like a sanction for [criminal] contempt of court than like a disposition on the merits or even an award of costs. An award under Rule 11 is a "sanction" for violating a rule of court. The obligation to answer for one's act accompanies the act; a lawyer cannot absolve himself of responsibility by dismissing his client's suit.
 
 
 18
 Id. at 1079.
 
 
 19
 Appellants offer three arguments against this reasoning. First, they point to the text of Rules 11 and 41, which "simply admit to no exception to the 'bright line' of the plaintiff's unfettered power to dismiss voluntarily and with finality pursuant to Rule 41(a)(1)(i)." In our view, however the wording of the two rules is not dispositive of the relationship between them. For the reasons elaborated below, we believe that the policies behind Rule 11 do not permit a party to escape its sanction by merely dismissing an unfounded case. The benefits to such a dismissal would accrue to precisely those plaintiffs for which Rule 11 intends "punishment and deterrence," Westmoreland v. CBS, Inc., 770 F.2d 1168, 1180 (D.C.Cir.1985), while the costs Rule 11 is designed to shift would remain with the defendant upon whom the plaintiff unfairly thrust them. Absent a contrary indication in the purposes of Rule 41, we are loathe to read Rule 11 so manifestly against its grain.
 
 
 20
 Appellants respond that we need not concern ourselves with such abuses of Rule 41, since the defendant can always "bar a Rule 41 dismissal by the simple expedient of filing either an answer or a motion for summary judgment." Under Rule 11, however, the defendant may stand on its motion to dismiss coupled with a motion for sanctions--as Hartmarx has done--and need not incur the burden of further pleadings. It is no answer to say that the defendant may preserve its Rule 11 motion only by incurring further unnecessary costs.
 
 
 21
 Second, appellant contends that affirmance here will undermine the Rule 11 interest in judicial efficiency by encouraging litigation "over many other newly-asserted exceptions to the bar of a Rule 41 ... dismissal." Appellants do not identify any such possible exceptions, however, and we can foresee none. Moreover, appellants ignore the deterrent effect that survival of a Rule 11 motion has on the number of sanctionable complaints--and the contrary effect that non-survival would have. If a party could immunize itself from a meritorious Rule 11 motion by voluntarily dismissing its case, the risks associated with the filing of an inadequately investigated complaint would be significantly diminished; and as the price of such misconduct fell, of course, its frequency would rise. In terms of appellants' efficiency argument, therefore, the relevant inquiry would compare the cost of the litigation that appellants predict will occur against the benefits realized by preventing so facile a circumvention of Rule 11 sanctions. In any event, we do not share appellants' fear that, after a Rule 41 dismissal, the survival vel non of a host or other matters will be litigated because of the outcome here. Therefore, we conclude that the gains from preserving the deterrent power of Rule 11 outweigh the offsetting costs, if any, of litigation concerning the survival of other, unspecified types of matters.
 
 
 22
 Third, appellants strive mightily to ward off the power of the analogy between Rule 11 sanctions and criminal contempt suggested by the Seventh Circuit, see p. 894, supra, for not only would a contempt citation survive even a voluntary termination of the case from which it arose, cf. United States v. United Mine Workers of America, 330 U.S. 258, 294, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947) (court may punish criminal contempt notwithstanding mootness of underlying action), but this longstanding "exception" to Rule 41 finality has not spawned the sort of litigation appellants suggest will inevitably follow in the wake of our holding that a Rule 11 motion likewise retains its vitality after voluntary dismissal. Thus, appellants go on at length about Donaldson v. Clark, 819 F.2d 1551 (11th Cir.1987) (en banc ), in which the court rejected the analogy in the context of deciding that due process does not require use of the Federal Rules of Criminal Procedure in Rule 11 proceedings. Id. at 1558-59. That case did not address, however, the distinct question of whether the analogy between Rule 11 and contempt proceedings tends to support post-dismissal jurisdiction over a pending Rule 11 motion. We think it surely does.
 
 
 23
 Rule 11 sanctions, like penalties for criminal contempt, are, as we said in Westmoreland, supra, punitive and deterrent in purpose (though they are also compensatory in effect). They are meant to deter the filing of unfounded pleadings, which is an abuse of the judicial process. As in criminal contempt, the court has an interest in deterring such conduct independent of the burdened party's interest in recovering its expenses. Accordingly, a court may award Rule 11 sanctions or issue a contempt citation sua sponte. The Advisory Committee on Rules put it this way: "The detection and punishment of a violation of the signing requirement ... is part of the court's responsibility for securing the [legal] system's effective operation." Advisory Committee Note, Fed.R.Civ.P. 11. In relevant respects, therefore, Rule 11 is analogous to criminal contempt; the systemic interest in its proper functioning requires that it be available in appropriate circumstances notwithstanding a private party's effort to cut its losses and run out of court, using Rule 41 as an emergency exit.
 
 
 24
 Appellant argues, in the alternative, that even if this court would generally hold that a Rule 11 motion survives a Rule 41 dismissal, we should nonetheless find jurisdiction lacking here due to the extraordinary lapse of time between the voluntary dismissal and the imposition of sanctions. We are sympathetic to the concern that a lawyer who has other business before the court may feel something of a chill while the Rule 11 motion pends; the sooner the matter is resolved the better. Indeed, the Advisory Committee specifically "anticipated that in the case of pleadings, the sanctions issue under Rule 11 normally will be determined at the end of the litigation...." Id. That is surely the better practice. The Committee also provided, however, that "[t]he time when sanctions are to be imposed rests in the discretion of the trial judge." Id. Though an extended delay is much to be lamented, therefore, we do not see that delay alone can divest the district court of jurisdiction properly vested there.
 
 
 25
 Accordingly, we conclude that the district court had jurisdiction to resolve appellees' Rule 11 motion notwithstanding voluntary dismissal of the underlying action and the subsequent delay in its ruling on the matter.
 
 III. RULE 11 LIABILITY
 
 26
 We find no difficulty in affirming liability under Rule 11 here, as none of appellants' arguments calls into doubt the "two obvious deficiencies" that the district court identified in their pre-filing investigation of the facts: specifically, appellants failed to engage in any inquiry whatsoever concerning the allegations against HF (as distinguished from HSM), and they claimed a nationwide conspiracy between defendants and selected merchants in each metropolitan area after polling merchants in only four eastern cities. Appellants' account of their efforts does no more than confirm these shortcomings; they make no attempt to justify them beyond first making the obvious point that it would have been bootless "to ask retailers if they were conspiring with Hartmarx to violate the antitrust laws" and then asserting that they pursued their prefiling inquiry "to the point where it was no longer cost effective to continue." It is impossible to see how "no inquiry" could be a "reasonable inquiry" with regard to the HF allegation or how, without more, an inquiry into four proximate markets could sustain an inference regarding practices elsewhere.
 
 
 27
 Appellants understandably, therefore, focus upon the district court's observation that "[i]n addition, counsel's random telephone investigation is far removed from the type of systematic inquiry needed to conclude that allegations of the severity alleged by plaintiff are 'well grounded in fact.' " According to appellants, the court's reference to a "systematic inquiry" erects a more stringent standard than the "reasonable inquiry" specified in Rule 11. Read in context, however, it is obvious that the reference to a "systematic inquiry" merely reflects the court's conclusion that, by contacting "salesmen instead of management personnel," and then at only a handful of stores out of dozens in each city, Cooter & Gell had not made an inquiry reasonably commensurate with the extent of their allegations.
 
 
 28
 Appellants further contend that their investigation of exclusive dealing was reasonable because Hartmarx had the greater access to the terms of its resale agreements and to the identities of its retailers. We agree to the point that disparate access to the information necessary for a putative plaintiff to determine the viability of its prospective cause of action is relevant to the inquiry called for in Rule 11. It simply does not follow, however, that a plaintiff can be excused altogether from the need to make a "reasonable inquiry" into the facts it alleges; rather, the disparate access point goes to the question of what is reasonable given the nature of the information to be obtained. For example, a reasonable inquiry into whether a defendant's activities affect interstate commerce would yield something closer to a certainty than would a reasonable inquiry into whether a defendant harbored an unlawful motive when discharging the plaintiff.
 
 
 29
 Here, appellant not only limited its investigation to a sampling of salesmen in four eastern cities, it did not even try to ascertain from Hartmarx whether it sold its suits through multiple retailers in major markets. If Hartmarx had refused to answer such a straightforward question, which would not seem to threaten any trade secret, then perhaps it would have been reasonable for appellants to infer that something was amiss. Normally, after all, one would expect a manufacturer to be pleased to say where its product can be bought; indeed, counsel for Hartmarx represented at oral argument that the company had in place an "800" telephone number in order to assist prospective customers in precisely this regard.
 
 
 30
 The district court also found that appellants were required but failed to adduce factual support for their claim that the "exclusive retail agent policy" they alleged had any anticompetitive effects, such as to run afoul of the Rule of Reason in antitrust. See Continental T.V. v. GTE Sylvania, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Examination of this rationale would require us to speculate on the extent to which any plaintiff could reasonably be expected to ascertain such information before it invokes the coercive powers of discovery. Since the district court applied the correct legal standard and offered substantial justification for its finding of a Rule 11 violation in other respects that go to the heart of the complaint, it is unnecessary for us to go further.
 
 IV. AMOUNT OF THE SANCTION
 
 31
 Appellants contend that the district court abused its discretion by awarding defendants more than half of a legal fee that the court itself found "excessive." Indeed, the district court found that defense counsel had overstaffed the case and that "the results of much of [the] research [conducted by defense counsel] were not reasonably necessary to achieve dismissal of the case...." The district court was not obliged to and did not detail how it arrived at the decision to allow over half of defendants' legal fees, but presumably based its decision upon an approximation of the amount of necessary work performed by defense counsel.
 
 
 32
 In reviewing a district court decision to award all or some lesser amount of the attorney's fees of a party prevailing on a Rule 11 motion in the face of a challenge that the award is excessive, we remain mindful that the district court, in such circumstances, exercises a virtually untrammelled discretion. See Perkinson v. Gilbert/Robinson, Inc., 821 F.2d 686, 691 n. 6 (D.C.Cir.1987) ("even if the award [which was reduced to $42,085 from the $71,202 requested] overcompensates plaintiff for unnecessary expenses caused by defendant, it could still have been justified for punitive and deterrent purposes"). Indeed, we can identify no instance in which this court has ordered any change in the amount of such a sanction. When the district court, without explanation, awards as a sanction an amount no greater than the costs and attorney's fees incurred by the party moving under Rule 11 and the award is challenged as excessive, only the very rarest case could justify our finding its decision an abuse of discretion.
 
 V. COSTS ON APPEAL
 
 33
 Hartmarx asks us to require appellants to pay the expenses, including attorney's fees, it has incurred in defending its award on appeal. Appellants respond by arguing that "Rule 11 simply does not reach beyond proceedings in the trial court" and that, accordingly, this court may award appellate expenses only if the appeal is "frivolous" under Fed.R.App.P. 38.
 
 
 34
 Although our decision in Westmoreland, 770 F.2d at 1179, involved an award of appellate expenses to one who successfully challenged a denial of Rule 11 sanctions by the district court, the reasoning we used to reach that conclusion dictates the outcome in the case at hand, where Hartmarx defends the grant of a Rule 11 award. In Westmoreland, we looked initially, by analogy, to Tamari v. Bache & Co. (Lebanon) S.A.L., 729 F.2d 469, 475 (7th Cir.1984), in which the Seventh Circuit noted that requiring a party to bear appellate expenses in defense of an award under Fed.R.Civ.P. 37 (abuse of discovery) "could greatly offset the amount of the sanction and thus create a disincentive for seeking sanctions." 770 F.2d at 1179. Based on the premise that the policies behind Rule 11, like those underlying Rule 37, support recovery of appellate costs by a party defending an award thereunder, we then reasoned that the same logic supports recovery of appellate costs in the reverse situation, involving a successful challenge to denial of Rule 11 sanctions. As we noted in Westmoreland: "It is very possible that appellate expenses might exceed substantially the sanction in the district court, thus forcing many litigants in appellant's position to conclude that the vindication of the Rule 11 interests is not worth the candle." Id.
 
 
 35
 Closely parsing the language of Rule 11, we ultimately concluded that an appellant may recover its appellate expenses as they were "incurred because of" the filing for which sanctions should have been imposed by the district court. Id. Today, we merely reaffirm Westmoreland 's premise that Rule 11 authorizes an appellee to recover the costs it incurs in a successful defense of a Rule 11 award. The First Circuit has adopted the same approach, for the same reasons. See Muthig, 838 F.2d at 607.
 
 
 36
 To resist the force of Westmoreland, appellants point to McLaughlin v. Bradlee, 803 F.2d 1197, 1206 (D.C.Cir.1986), in which we affirmed a Rule 11 sanction but nonetheless declined to award appellees the expenses they incurred in defending the matter on appeal. It appears, however, that appellees in that case did not argue that Rule 11 authorized or required such an award but, instead, merely called upon this court to exercise its own authority to sanction "frivolous" appeals under Fed.R.App.P. 38. Accord Basch v. Westinghouse Electric Corp., 777 F.2d 165, 175 (4th Cir.1985) (appellate defense of Rule 11 and Rule 37 sanction not recoverable where appeal "not frivolous nor ... interposed to harass ... or to delay implementation of a valid discovery order," but no indication that appellee invoked Rule 11 as basis for recovery of appellate expenses).
 
 
 37
 Appellants note further that the Ninth Circuit apparently takes a different view than ours concerning the relevant standard for recovery of appellate expenses. In Orange Production Credit Assoc. v. Frontline Ventures, Ltd., 801 F.2d 1581 (9th Cir.1986), the court rejected appellees' argument "that the policy behind Rule 11 mandates that fees on appeal be awarded whenever a district court's award of Rule 11 sanctions is affirmed." Id. at 1582. The Ninth Circuit denied recovery of appellate expenses because "the appeal was not frivolous under Fed.R.App.P. 38." Id. at 1583. The court sought to distinguish Westmoreland on the ground that the appeal there was taken in order to obtain an award of fees erroneously denied by the district court. Id. at 1583 n. 1. The distinction is obscure, however, not only as a matter of logic, but also because the Ninth Circuit itself noted without further comment that Westmoreland "referred to policy considerations which favor an award of fees on appeal in order to preserve sanctions awarded by the trial court"--the very situation in which the Ninth Circuit denied recovery.
 
 
 38
 The Seventh Circuit, in dicta, has spoken to the relationship between Fed.R.Civ.P. 11 and Fed.R.App.P. 38 as well, noting that "just as the district court cannot award fees under Rule 38 of the appellate rules, ... so the court of appeals cannot award fees under Rule 11 of the civil rules." Hays v. Sony Corp. of America, 847 F.2d 412, 420 (7th Cir.1988) (emphases in original). Accord Steffl v. J.I. Case, 862 F.2d 692, 696-97 n. 4 (8th Cir.1988) (dictum). The civil rules, of course, "govern the procedure in the United States district courts...." Fed.R.Civ.P. 1 (emphasis added). Here, however, we do not "award fees under Rule 11"; we merely reaffirm that the district court's award under Rule 11 of expenses "incurred because of" the unfounded filing should include appellate expenses reasonably incurred in defense of that award. As in Westmoreland--and as the Seventh Circuit itself has recently done--we remand to the district court to determine such expenses and, ultimately, to enter an appropriate award. See Westmoreland, 770 F.2d at 1179 ("calculation of the amount of the appellate attorneys' fee award can best be made by the district court"); Hamer v. County of Lake, 871 F.2d 58, 60 (7th Cir.1989) ("remand[ing] in order that the district court may make an additional award of attorney's fees to the appellees under Rule 11 for legal services required in successfully defending [a Rule 11 award]").
 
 VI. CONCLUSION
 
 39
 Having concluded that the district court had jurisdiction to resolve the motion for Rule 11 sanctions, that the court correctly found appellant's pre-filing inquiry to be inadequate, and that the court's determination of the amount of the sanction was within its broad discretion, we affirm the order of the district court in all respects. In addition, appellees are entitled to reasonable appellate expenses, as determined by the district court on remand.
 
 
 40
 So ordered.